Approved: _____
　　　　　　Ryan B. Finkel
　　　　　　Assistant United States Attorney

Before:　HONORABLE JAMES L. COTT
　　　　　United States Magistrate Judge　　　**21 MAG 4262**
　　　　　Southern District of New York

- - - - - - - - - - - - - - - - - x
　　　　　　　　　　　　　　　　　:
UNITED STATES OF AMERICA　　　　:　**SEALED COMPLAINT**
　　　　　　　　　　　　　　　　　:
　　- v. -　　　　　　　　　　　　:　Violations of
　　　　　　　　　　　　　　　　　:　18 U.S.C. §§ 1014, 1343,
SETH ANDREW,　　　　　　　　　　 :　1956(a)(1)(B)(i) and 2
　　　　　　　　　　　　　　　　　:
　　　　　　　Defendant.　　　　　:　COUNTY OF OFFENSE:
　　　　　　　　　　　　　　　　　:　NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

　　　　　MELODY SHEN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
(Wire Fraud)

　　　　1.　From at least in or about March 2019 up to and including at least in or about May 2020, in the Southern District of New York and elsewhere, SETH ANDREW, the defendant willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ANDREW stole approximately $218,005 belonging to charter schools, and in connection therewith and in furtherance thereof, ANDREW transmitted and caused to be transmitted over interstate wires emails necessary to implement his scheme, including emails transmitted through the Southern District of New York.

　　　　(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
(Money Laundering)

2. From at least in or about March 2019 up to and including at least in or about May 2020, in the Southern District of New York and elsewhere, SETH ANDREW, the defendant, in an offense affecting interstate and foreign commerce, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud scheme charged in Count One of this Complaint, knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, location, the source, the ownership, and the control of the proceeds of the specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## COUNT THREE
(False Statements to a Bank)

3. From at least in or about March 2019 through at least in or about August 2019, in the Southern District of New York and elsewhere, SETH ANDREW, the defendant, knowingly made false statements and reports for the purpose of influencing the actions of a financial institution, the accounts of which were insured by the FDIC, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, to wit, ANDREW stated and caused to be stated misrepresentations to a financial institution that he (i) lawfully controlled and/or owned assets, when in truth and in fact, he did not; and (ii) was a "key executive" with "control" of a particular charter school in order to obtain a more favorable mortgage interest rate from an FDIC insured financial institution.

(Title 18, United States Code, Sections 1014 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, and my conversations with law

enforcement officers, law enforcement employees, and witnesses, as well as a review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

5.   Based on my review of documents, my conversations with law enforcement officers and witnesses, my personal involvement in this investigation, and my training and experience, I believe that SETH ANDREW, the defendant, used his former association with a network of charter schools ("School Network-1") to steal $218,005 of School Network-1's money from bank accounts that School Network-1 maintained as reserves to comply with laws and regulations governing charter schools in New York State.   To effectuate his theft, ANDREW improperly used his School Network-1 email account ("Andrew's School Network-1 Email Account"), to send an email to a bank employee for the purpose of convincing the bank employee that ANDREW was currently associated with School Network-1 when, in truth and in fact, he was not.

6.   After stealing School Network-1's money, SETH ANDREW, the defendant, effectuated a series of financial transactions in which ANDREW attempted to conceal that the source of the stolen funds was School Network-1 and make it appear that the stolen funds belonged to a non-profit organization that ANDREW founded, and currently appears to control, referred to herein as "Civic Network-1."  That is, ANDREW washed the stolen funds of their association with School Network-1, which ANDREW does not control, and disguised the stolen funds as property of Civic Network-1, which ANDREW appears to control.

7.   In the process of laundering the stolen funds, SETH ANDREW, the defendant, first transferred them to an account at a particular FDIC insured Bank.  By so doing, ANDREW represented to that bank that he lawfully controlled the stolen funds and was lawfully permitted to open an account for a particular charter school.  The deposit of the stolen funds inflated ANDREW's assets at the bank and thereby entitled ANDREW to obtain an interest rate deduction on a mortgage he used to purchase an apartment in Manhattan, New York that he otherwise would not have been entitled to receive.

**Background of School Network-1 and Seth Andrew's Former Employment with School Network-1**

8.  Based on my review of documents, my conversations with law enforcement officers, my conversations with witnesses, my personal involvement in this investigation, and my training and experience, I have learned, in substance and in part, that:

a.  In or about 2005, SETH ANDREW, the defendant, helped found School Network-1, a series of public charter schools then based in New York City. School Network-1 has since expanded and now operates charter schools located throughout the United States. After founding School Network-1, ANDREW became the superintendent of School Network-1 and in that capacity was its de facto leader along with a Board of Trustees.

b.  On or about October 11, 2012, ANDREW announced that at the end of that academic year, i.e. the spring of 2013, ANDREW would resign from his position as superintendent of School Network-1. ANDREW's resignation announcement was publicly made in an email (the "Departure Email"), which I have reviewed, that reads, in part, "I have decided that I will 'graduate' with our seniors at the end of this academic year and transition out of the role of Superintendent in order to focus on exciting new challenges in education." The Departure Email further noted that ANDREW would continue to develop School Network-1's alumni network and work with its then-sister organization named Civic Network-1, a registered 501(c)(3) non-profit, that focuses on developing young adults' skills and commitment to civic engagement.

c.  The Departure Email contained a photograph of SETH ANDREW, the defendant, wearing a particular yellow hat (the "Yellow Hat"), which is reproduced below:



4

d. Based on my involvement in this investigation, I have learned that the Yellow Hat is essentially ANDREW's "calling card." The Yellow Hat signifies a tie to School Network-1 and his leadership of it. Indeed, the Departure Email answered the question "Who, [in light of ANDREW's departure from School Network-1] will wear the Yellow Hat?" The emailed answered, "we ALL wear the Yellow Hat!" Publicly available photographs of ANDREW often depict him wearing the Yellow Hat.

e. Civic Network-1 and School Network-1 each have two word names and the first word of their names is the same. Based on my involvement in this investigation, I have learned that Civic Network-1 and School Network-1 are similarly named because the name of Civic Network-1 was at one time used as School Network-1's name.[1]

f. Civic Network-1 and School Network-1 were legally intertwined until on or about October 31, 2014, when, pursuant to a signed agreement, Civic Network-1 and School Network-1 officially split into two distinct entities. As of that date, School Network-1 ceased performing most support services for Civic Network-1 although there remained some select relationship between the entities. Documentation effectuating their separation, which I have reviewed, was signed by ANDREW on behalf of Civic Network-1 and another individual on behalf of School Network-1.

g. When, in the Spring of 2013, ANDREW left his role as superintendent of School Network-1, he began employment in the United States Department of Education and, thereafter, as a senior advisor in the Office of Educational Technology at the White House, until in or about November 2016. During this time period, based on documents I have reviewed, ANDREW's salary was paid by School Network-1 via an Intergovernmental Personnel Act Agreement, which allowed individuals to work in Government service while receiving pay and benefits from another employer.

---

[1] Based on emails provided to the FBI by School Network-1, I have learned that on or about September 23, 2011, School Network-1's attorneys notified employees of School Network-1, by email, that its name change from Civic Network-1 to School Network-1 was effective as of that date. ANDREW was a recipient of this email notification.

h.   In or about January 2017, ANDREW ended his relationship with School Network-1.  To signify that separation, on or about January 26, 2017, the then-CEO of School Network-1 emailed ANDREW at Andrew's School Network-1 Email Account.  The subject line of the email was "Closing Out," and it read, in part:

i.   "I wanted to follow up with you regarding the close out of your employment with us [i.e. School Network-1] . . . . 1) Your benefits will stay active until the June 2017; however this will be through COBRA, but we are paying that extra cost to you to cover COBRA expenses. 2) Your $100,000 payment will be processed imminently. 3) We will transfer your [School Network-1] emails over and offer forwarding to your [Civic Network-1 email] account.  Seth, while this is official, I'll refrain from too much, but there are no words that would adequately express my respect and gratitude."[2]

i.   Based on my involvement in this investigation and an interview with a former School Network-1 executive, I understand that following the separation, Andrew's School Network-1 Email Account would be kept active so that emails sent to it could be forwarded to an email account also used by ANDREW but with a domain referring to Civic Network-1.  Thus, by, January 26, 2017, if not earlier, ANDREW was no longer part of School Network-1 and, according to School Network-1 former, and current, employees, ANDREW was not supposed to send emails from Andrew's School Network-1 Email Account.

j.   ANDREW appears to be associated with Civic Network-1 to this day.

### School Network-1's Escrow Accounts

9.   Based on my review of documents, my conversations with law enforcement officers, my conversations with witnesses, my personal involvement in this investigation, and my training and experience, I have learned, in substance and in part, that:

a.   The New York State Board of Regents generally requires that each charter school maintain an escrow

---

[2] Based on interviews with School Network-1 employees, I have learned that the $100,000 payment was made to compensate ANDREW for the salary he would have received for that year.  According to School Network-1 employees and documents I have reviewed, School Network-1 made the payments owed to ANDREW.

6

account that may be accessed only for specific reasons.  For example, based on my review of a charter agreement for one of School Network-1's charter schools, dated June 21, 2011 (the "Agreement"), I have learned that pursuant to the Agreement that charter school must maintain at least $75,000 to pay for legal and audit expenses in the event the school was to be dissolved.  A failure to maintain that escrow amount is considered a "material" violation of the charter agreement with the Board of Regents.  The Agreement was signed by SETH ANDREW, the defendant, and bears ANDREW's name as the "Applicant" seeking to establish a charter school in New York State.

        b.  Based on my review of bank records, I have learned that ANDREW and other School Network-1 representatives opened at least three bank accounts to establish escrow accounts for School Network-1 schools: Escrow Account-1, Escrow Account-2, and Escrow Account-3 (collectively, the "Escrow Accounts").  The Escrow Accounts were opened at the same FDIC insured bank ("Bank-1").

        c.  Escrow Account-1 was opened on or about March 5, 2009, in Harlem, New York, by ANDREW and another employee of School Network-1 ("Employee-1").  In opening account paperwork, ANDREW identified himself as "Head of School."  Escrow Account-1 was opened in the name of "[School Network-1] Charter School."

        d.  Escrow Account-2 was opened on or about March 8, 2011 by ANDREW and Employee-1.  Escrow Account-2 pertained to a different charter school within School Network-1.  ANDREW listed himself, and two others, as "signers" for Escrow Account-2, indicating they had authority to withdraw money from Escrow Account-2.  Escrow Account-2 was opened in the name of "[School Network-1] Harlem Charter School Escrow Account."

        e.  Escrow Account-3 was opened on or about March 26, 2013, by four employees of School Network-1, including ANDREW. The account opening documents list all four employees' names, including ANDREW's name, however, ANDREW's signature is not present on the bank opening documents.  Escrow Account-3 was opened in the name of "[School Network-1] Endurance Charter School Escrow Account."

        10.  Based on an interview with a former executive of School Network-1, who is familiar with School Network-1's requirements to maintain the Escrow Accounts, I have learned, in substance and in part, that the Escrow Accounts are "not to be touched at all and there should be no money movements" from them.

The executive further told me that SETH ANDREW, the defendant, had no right to the money in the Escrow Accounts. Based on several interviews with School Network-1 employees, a consultant hired by School Network-1 to manage its finances, and a board member of School Network-1 Charter School, I have learned that the Escrow Accounts were funded by the New York City Department of Education. The concept that School Network-1 should be funded primarily by Government funding was an idea professed by ANDREW to a Board Member of "[School Network-1] Charter School." That Board Member recalls, in substance and in part, that ANDREW was philosophically opposed to funding any of the schools in School Network-1 with anything other than Government funding.

### Andrew Steals the Funds in the Escrow Accounts and Transfers the Funds to Accounts held by Civic Network-1

11. Based on my review of documents, my conversations with law enforcement officers, my conversations with witnesses, my personal involvement in this investigation, and my training and experience, I have learned, in substance and in part, that:

   a. On or about March 28, 2019, SETH ANDREW, the defendant, closed Escrow Account-1 and withdrew its assets. In particular, based on documents I have reviewed, I have learned that on March 28, 2019, ANDREW signed a "checking closeout debit" in the amount of $71,870.60 and Bank-1 issued a bank check in the amount of $71,881.23 to "[School Network-1] Charter School" ("Check-1").[3] Documents indicate that Escrow Account-1 was closed at a Bank-1 branch on 94th and Broadway in New York, New York.

   b. That same day, on or about March 28, 2019, ANDREW closed Escrow Account-2 and withdrew its assets. In particular, ANDREW signed a "checking closeout debit" in the amount of $70,637.75 and Bank-1 issued a bank check in the amount of $70,642.98 to "[School Network-1] Harlem Charter" ("Check-2").[4] Documents indicate that, just like Escrow Account-1, Escrow Account-2 was closed at a Bank-1 branch on 94th and Broadway in New

---

[3] The difference between the amount of Check-1 and the closeout debit for Escrow Account-1 appears to be an interest payment from Bank-1 that was paid at the time ANDREW closed the account.

[4] The difference between the amount of Check-2 and the closeout debit for Escrow Account-2 appears to be an interest payment from Bank-1 that was paid at the time ANDREW closed the account.

York, New York. Thus, it appears Escrow Account-1 and Escrow Account-2 were closed by Andrew at the same time.

   c. The same day that Escrow Account-1 and Escrow Account-2 were closed, ANDREW opened a business bank account in the name of "[School Network-1] Charter School" ("Fraud Account-1") in-person at branch of a particular FDIC insured bank ("Bank-2") on 39th and 7th Avenue in New York, New York. Fraud Account-1 was opened by a particular Bank-2 employee ("Bank Employee-1").

   d. Fraud Account-1 was associated with, what I have learned from open source research, is the address of Civic Network-1 -- not School Network-1's address. ANDREW further associated Fraud Account-1 with his Civic Network-1 email address -- not Andrew's School Network-1 Email Account. ANDREW is listed as the signer of Fraud Account-1 and the "Key Executive with Control of the Entity [i.e. "[School Network-1] Charter School"]." Bank-2 documentation indicates that the "Name/Entity Verification" for Fraud Account-1 was obtained via "Filed Org/Assn Articles or Bylaws."

   e. Based on my review of documents, I have learned that on March 28, 2019 at approximately 13:31 EDT -- the same day ANDREW closed out Escrow Account-1 and Escrow Account-2 and opened Fraud Account-1 -- Andrew's School Network-1 Email Account forwarded an email ("Email-1") to an email address that appears to be Bank Employee-1's email address.

    i. Email-1 contained a chain of emails from in or about 2008 sent by School Network-1's attorneys to ANDREW at Andrew's School Network-1 Email Account. That chain of emails confirmed that "[School Network 1] Charter School" was registered as a not for profit. Email-1 also attached the bylaws, certificate of incorporation, registration statement, and IRS determination letter for "[School Network-1] Charter School."

    ii. Based on an interview with Bank Employee-1, my training and experience as well as my involvement in this investigation, I believe that ANDREW used his access to Andrew's School Network-1 Email Account and, in particular, used Email-1 to falsely represent to Bank Employee-1 that as of March 28, 2019 ANDREW was a "Key Executive with Control of" School Network-1 Charter School, when, in truth and in fact, he was not. Indeed, as described above, Bank-2 verified ANDREW's purported association with "[School Network-1] Charter School" via "Filed Org/Assn Articles or Bylaws," which were the attachments to Email-

9

1. Based on an interview with Bank Employee-1, I have learned that Bank-2 would not have opened Fraud Account-1 without receiving Email-1, or some other proof that ANDREW was associated at the time with School Network-1.

   iii. Based on returns pursuant to judicial process and conversations with School Network-1 employees, I have learned that Andrew's School Network-1 Email Account is hosted by Google as part of their Gmail service. I have further learned that on or about March 28, 2019, Google did not have Gmail servers in the State of New York. Accordingly, it appears that (a) Email-1 was sent by ANDREW while at a Bank-2 branch in New York, New York; (b) Email-1 then exited New York State and traveled through Google's servers located outside of New York State; (c) Email-1 next exited Google's servers, routed back into New York State and into New York, New York to Bank Employee-1 who, on or about March 28, 2019, was working in Manhattan, New York and opening Fraud Account-1 at ANDREW's direction.

  f. The opening deposit for Fraud Account-1 was approximately $71,881.23 which ANDREW paid using Check-1. In connection with the deposit, ANDREW signed his name to endorse Check-1 apparently on behalf of "[School Network-1] Charter School" even though he was no longer associated with School Network-1.

  g. On or about April 2, 2019, ANDREW deposited Check-2 into Fraud Account-1 using an ATM machine located in Baltimore.[5]

  h. On or about October 17, 2019, ANDREW closed out Escrow Account-3. ANDREW signed a "checking closeout debit" in the amount of $75,477.79 and Bank-1 issued a bank check in the

---

[5] It appears that ANDREW used an ATM to deposit Check-2 because the entity to which Check-2 was made out to ("[School Network-1] Harlem Charter") is slightly different than the name on Fraud Account-1 ("[School Network 1] Charter School"). Indeed, I believe that ANDREW possessed both Check-1 and Check-2 on March 28, 2019, when he opened Fraud Account-1 in-person but only chose to deposit Check-1 into Fraud Account-1. Bank Employee-1 informed me, in substance and in part, that because Check-2 was made out to "[School Network-1] Harlem Charter," rather than "[School Network 1] Charter School", that, had ANDREW attempted to deposit Check-2 when ANDREW opened Fraud Account-1, Bank Employee-1 would not have deposited Check-2 into Fraud Account-1.

amount of $75,481.10 to "[School Network-1] Endurance" ("Check-3").

   i. I have reviewed surveillance footage recorded by Bank-1 (the "Footage"). The Footage depicts the individual who closed Escrow Account-3 and it appears that individual is ANDREW, whose appearance I am familiar with based on photographs in the Departure Email as well as from other publicly available sources. Notably, the individual who closed Escrow Account-3, i.e. ANDREW, is wearing the Yellow Hat. (See supra ¶ 8.c.) A still image from the Footage depicting ANDREW wearing the Yellow Hat is reproduced below:



   j. On or about October 21, 2019, ANDREW opened a business bank account in the name of "[Civic Network-1] Fund Inc." ("Fraud Account-2") at a bank branch located in New York, New York of a particular FDIC Insured bank ("Bank-3"). The day it was opened, ANDREW signed his name to endorse Check-3 and deposited Check-3 into Fraud Account-2.

   k. On or about November 19, 2019, ANDREW closed Fraud Account-1 and obtained a certified check from Bank-2 made payable to "[School Network-1] Charter School" in the amount of $144,473.29 ("Check-4"). Based on documents from Bank-3, it appears that ANDREW attempted to deposit Check-4 into Fraud Account-2 but was unable to do so because Check-4 was payable to "[School Network-1] Charter School" whereas Fraud Account-2 was opened in the name of "[Civic Network-1] Fund Inc." It appears that, on or about November 19, 2019, ANDREW obtained a second check from Bank-2 made payable to "[Civic Network-1] Fund" in the amount of $144,473.29 ("Check-5"). On or about November 19, 2019, Check-5 was successfully deposited into Fraud Account-2.

11

l. On or about November 20, 2019, ANDREW transferred approximately $210,000 from Fraud Account-2 to a certificate of deposit held by Bank-3 (the "Fraud CD"). The Fraud CD was opened on or about November 20, 2019 in the name of "[Civic Network-1] Fund, Inc." "Seth Andrew" is listed as the "President" on account opening paperwork for the Fraud CD and Phone-1, along with another phone number, is listed as ANDREW's telephone number.

m. On or about May 20, 2020, the Fraud CD matured earning approximately $2,083.52 in interest. That same day the proceeds of the Fraud CD were transferred to an account at Bank-3 ("Civic Network-1 Fund Account") where it appears to have been co-mingled with other Civic Network-1 funds. The Civic Network-1 Fund Account is held in the name of Civic Network-1 Fund, Inc. and appears to be used by Civic Network-1 as one of its operating accounts, which ANDREW controls.

### ANDREW's False Statements To Bank-2

12. Based on my review of documents, my conversations with law enforcement officers, my conversations with witnesses, my personal involvement in this investigation, and my training and experience, I have learned, in substance and in part, that:

a. On or about August 21, 2019, SETH ANDREW, the defendant, and his spouse, purchased a residential property located in Manhattan, New York ("Propety-1") for approximately $2,368,000. To effectuate that purchase, SETH ANDREW, the defendant, and his spouse obtained a mortgage from Bank-2 in the amount of $1,776,000 with an interest rate of 2.5%.[6]

b. As of in or about March 2019, Bank-2 offered certain customers, as a promotion, more favorable mortgage interest rates if those customers maintained a certain amount of funds in Bank-2 accounts. Specifically, I have learned, that for every $250,000 on deposit, up to a total of $1,000,000, Bank-2 would lower that qualifying customer's mortgage interest rate by 0.125%. Thus, in total, if a qualifying customer maintained $1,000,000 or more of their funds in Bank-2 accounts that customer would receive a 0.5% interest rate deduction on a Bank-2 mortgage.

c. To take advantage of the interest rate deduction promotion Bank-2 requires that the funds a customer

---

[6] The mortgage on Property-1 is a 10-year Adjustable Rate Mortgage (ARM), thus this rate will adjust after 120 months.

12

deposits, be funds owned by the customer or, in some instances, a business the customer owns, controls or is lawfully associated with. Bank-2 does not permit a customer to utilize money owned by someone else to gain the benefit of the interest rate deduction promotion.

   d. Bank Employee-1 recalled, in substance and in part, that ANDREW brought money from another bank to Bank-2 so that he could take advantage of the mortgage interest rate deduction promotion. In or about March 2019, ANDREW opened approximately five accounts at Bank-2 including Fraud Account-1. As described above, in order to open Fraud Account-1 ANDREW represented that, in or about March 2019, he was a "[k]ey executive," with "control" over "[School Network-1" Charter School." (See supra ¶ 11.d.)

   e. By in or about April 2019, ANDREW deposited a total of approximately $1,007,716 with Bank-2 and therefore became eligible to receive a 0.5% interest rate deduction -- the largest deduction a customer can receive from Bank-2's promotion -- in connection with ANDREW's mortgage on Property-1.

   f. Accordingly, I believe that by falsely claiming ownership of the approximately $142,524 in Fraud Account-1, which, as described above, in truth and in fact, belong to School Network-1, ANDREW lied to Bank-2. I further believe that in order to open Fraud Account-1, so that the approximately $142,524 held in that account would enable ANDREW to take full advantage of Bank-2's interest rate deduction program, ANDREW lied to Bank-2 when he claimed he was a "[k]ey executive" with "control" over "[School Network-1] Charter school."

13. Based on my training and experience, and involvement in this investigation, I believe that SETH ANDREW, the defendant, effectuated the scheme described herein, not only to steal the money in the Escrow Accounts, but also to secure a full 0.5% interest rate deduction from Bank-2 thereby avoiding approximately 0.125% in interest due to Bank-2 for the mortgage on Property-1.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of SETH ANDREW, the defendant, and he be imprisoned or bailed, as the case may be.

      /s/Melody Shen with permission JLC
      Melody Shen
      Special Agent
      Federal Bureau of Investigation

Sworn to me through the transmission of this
Complaint by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1, this
20th day of April, 2021

_____
JAMES L. COTT
United States Magistrate Judge